UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| RONTAVEUS WALKER, individually and as administrator of the estate of Rodney Walker, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 5: 20-397-DCR |
| V. | ) ) | |
| SOUTHERN HEALTH PARTNERS, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Rodney Walker was arrested for a parole violation and booked into the Madison County Detention Center on September 30, 2019.  He was transferred to the University of Kentucky Medical Center on October 21, 2019, where he subsequently passed away due to an intra-abdominal hemorrhage secondary to liver cancer.  Walker's adult children, as the administrators of his estate ("plaintiffs"), seek to hold Madison County Detention Center ("MCDC" or "jail") and certain personnel, as well as Southern Health Partners ("SHP") and certain SHP medical providers liable.

The plaintiffs filed suit under 42 U.S.C. § 1983, alleging that the defendants were deliberately indifferent to Walker's serious medical needs.  They also assert claims of negligence and wrongful death.  In addition, the administrator of the estate of Walker's widow (Virginia) brings a claim for loss of consortium.  The MCDC and its personnel ("the MCDC Defendants") have filed a motion for summary judgment, as has SHP and its medical providers ("the SHP Defendants.")

- 1 -

The individual MCDC Defendants are entitled to qualified immunity regarding the plaintiffs' § 1983 and state-law negligence claims.  As a result, summary judgment will be granted in their favor with respect to those claims.  However, the deliberate indifference claim asserted pursuant to *Monell* will proceed against MCDC.  And because the plaintiffs have established a genuine issue of material fact concerning their § 1983 and state-law negligence claims against SHP, those claims also will be permitted to proceed.  Summary judgment will be granted in favor of the defendants with respect to the claim for loss of consortium because the plaintiffs have failed to present more than a scintilla of evidence to support that claim.

## I.      Background

Rodney Walker ("Walker") presented to the emergency department at Baptist Health in Richmond, Kentucky on August 28, 2019, complaining of abdominal pain.  [Record No. 85-1] Kent Kessler, M.D., performed an appendectomy.  During the procedure, he discovered "peritoneal implants," which were suspicious for carcinoma.  Kessler excised the implants and sent them for biopsy.  While Kessler could not find Walker's family members to talk to following the surgery, he discussed the surgery with Walker while he was in recovery.  Kessler received the biopsy results on September 3, 2019, indicating the presence of metastatic high-grade neuroendocrine carcinoma.

Walker had a follow-up visit with Kessler the next day.  Kessler noted:

I had a detailed and extensive discussion with the patient in the office and they understand that they need to undergo further evaluation with PET scan and future upper and lower endoscopy.  I have reviewed the patient's previous CT scan at the time of appendicitis with the radiologist over the phone, PET scan I think will better delineate any possible further metastatic disease.  I would like to see the patient back in the office in 2 weeks for clinical follow up after PET scan . . . .

He fully understands his pathology report, he fully understands that there is a neuroendocrine carcinoma associated with the appendix, he fully understands that he did have appendicitis but a second problem was found at the time of operative intervention.  He understands the importance of clinical follow up with me.  There were no questions for me at the end of the office visit.

[Record No. 85-2]

Walker saw his primary care provider, Kimberly Snowden, APRN, on September 6, 2019.  According to Snowden's note, Walker reported that he had recently had his appendix removed, which showed "neuroadenoma" and that he was scheduled to undergo a PET scan. [Record No. 85-3]    Walker advised Snowden that he had been using heroin but after his birthday he was going to "the House of Mercy" to get clean.  He added that his wife also was a heroin user, so he was going to go live with his daughters.

Snowden sent Walker to the University of Kentucky Medical Center for a gastroenterology/hepatology consult with Mary Broadbent, APRN, on September 13, 2019. [Record No. 85-4]  Walker reported his appendectomy, but did not mention a tumor or the need for any further testing.  He expressed a desire to stop using drugs and Broadbent provided him with the number of an addiction specialist.  [Record No. 85-3]

On September 19, 2019, Dr. Kessler sent a letter to Walker stating:

This letter is in reference to your recent appendectomy that was performed on 08/28/19 which, as you know, showed carcinoma associated with your appendix.  You need close follow-up including CT scan of the abdomen and pelvis.  Our office has tried to contact you on several occasions by telephone, all of our attempts to contact you have been unsuccessful and we continue to receive a message stating that your phone has restrictions which will not allow the call to go through.

Please contact our office as soon as possible so we can schedule the above mentioned CT scan and follow-up appointments needed thereafter.  Please do not neglect your healthcare.

Walker was arrested for a parole violation on September 30, 2019. Deputy Steve Howard booked Walker into the MCDC. Walker answered "no" in response to a "standard medical question" asking whether he had any serious medical conditions that may require attention while in custody. [Record No. 84-19]   However, he did indicate that he "had his appendix removed 3 weeks ago." He also reported that he had been taking prescription medicines that he may need to continue while in custody, but he was unsure what the medications were. *Id.*

There were approximately 400 inmates at MCDC in October 2019. [Record No. 100-16, p. 280] MCDC began contracting with SHP in 2014 to provide medical care for its inmates. Nurse Practitioner Roy Washington, an independent contractor for SHP, acted as medical director for the jail during the relevant period. Washington visited the jail every other Tuesday to provide onsite services and was "on-call 24/7." [Record No. 100-24, p. 64]

LPN Leslie Steenbergen was a regional manager for SHP and was "not a regular on-site." Instead, she would visit the jail at least every 90 days. [Record No. 100-19, p. 19] Her duties included auditing charts and overseeing staff continuing education, as well as being an on-call nurse. LPN Jessica Houk held the position of Medical Team Administrator ("MTA"). [Record No. 100-23, p. 26] Her duties included scheduling, completing reports, and providing patient-inmate care. Kandi Ginn, LPN also worked for SHP, providing patient care at MCDC during the relevant period. [Record No. 100-25, p. 34] Ginn reported to Houk and "always kept [her] aware of anything that was going on." *Id.* at 43.

Walker put in a request for medical assistance on October 2, 2019. [Record No. 84-20] He reported, "need to see someone ASAP about this situation [sic] I'm having really bad pain in my side." Nurse Ginn saw Walker on October 3, 2019, and completed a "clinical

- 4 -

pathway/patient clinical data form" based on her assessment.  [Record No. 84-21]  She documented that Walker had stomach pain of two weeks' duration, which he rated as nine out of ten in intensity.  [Record No. 84-21]  His blood pressure was 140/80, pulse was 110, respirations were 16, and his oxygen saturation was 99 percent.  He weighed 165 pounds and his temperature was 100.4 degrees.  She noted that he was calm, oriented, alert, and cooperative.  Beside "physician order," Ginn's note states, "Ibu 600 mg x 1 dose[,] ROI signed."  Ginn testified during her deposition that she was allowed to give ibuprofen and Tylenol for three days without a doctor's order.  [Record No. 100-25, p. 124]  Washington signed off on Ginn's October 3, 2019 encounter note during his on-site visit on October 8, but did not see Walker.

During recorded phone calls with his adult children on October 6 and 7, Walker complained of stomach pain, bloating, and weakness.  He told them that the doctor must have "left something in [his] stomach" when he performed the appendectomy.  He also complained that the jail had not provided his prescription medications.  On October 7, Walker told his daughter that he was going to ask jail staff to call an ambulance.  Later that day, however, he asked his daughter if she would call an ambulance and expressed frustration at the lack of response he received to his complaints, telling her there was no doctor at the jail.

Ginn saw Walker at 5:30 p.m. on October 8, 2019, presumably after Washington's shift had ended.  [Record No. 84-22]  He still complained of stomach pain and a sensation of food getting stuck in his upper stomach.  Ginn contacted Washington by phone and described Walker's symptoms.  Washington stated that "medical" needed to contact Walker's surgeon to obtain his thoughts concerning further treatment.  Walker advised Ginn that his surgeon's name was Kent Kiser.

On October 11, 2019, at 1:00 p.m., Ginn contacted Dr. Kessler's office and was advised that Walker had not kept his follow-up appointment and needed to schedule a CT scan.  When Ginn told Kessler's office about Walker's complaints, she was advised that he would need to schedule an appointment with Dr. Kessler.  It is unclear whether anyone at Kessler's office gave Ginn any information about Walker's medical condition or his cancer diagnosis. Kessler's office scheduled an appointment for October 23, 2019.  [Record No. 84-23]

Later that evening during med pass, Walker reported that he was sweating and not feeling well.  His vital signs were recorded as follows: temperature 96.8 degrees; blood pressure 130/80 mmHg; oxygen 99 percent; heart rate 106 beats per minute; and respiration rate 18 breaths per minute.  "Medical" contacted NP Washington, who ordered Prilosec, Mylanta, and Tylenol.  Washington also was advised of Walker's upcoming appointment with Dr. Kessler.  [Record No. 84-24]

On the morning of October 12, during med pass, Walker's cellmates informed deputies that Walker "could not move and was in pain."  [Record No. 84-25]  Deputies informed medical staff of the situation, who evaluated Walker's vital signs.  Medical staff again contacted NP Washington who advised staff to send Walker to the emergency department for evaluation.[1]

Walker was transported to the Baptist Health emergency department.  David Turley, M.D., evaluated his complaints of abdominal pain and ordered laboratory tests, as well as CT scans of the abdomen and pelvis.  The "after visit summary" notes reflect that Walker had high

---

[1]     The October 12, 2019 progress note is authored by Nurse Ginn but refers to "medical" as the treatment provider.

blood pressure and a diagnosis of secondary liver cancer.  Walker was instructed to follow-up at the first available appointment with Dr. Kessler and was transported back to MCDC. [Record No. 84-26]

On October 14, 2019, Nurse Houk contacted Dr. Kessler's office to try and advance Walker's appointment, per Dr. Turley's recommendation.  That day, Walker reported pain, weakness, and diarrhea with blood.  Houk called Washington who ordered Tylenol and Zofran. Houk's note also indicates that medical staff initiated "priority movement" to Roederer Correctional Complex due to "new diagnosis of liver cancer."[2]  Houk remarked that "oncology called from Dr. Shell's office" setting up an appointment for 8:30 a.m. the following day. [Record No. 84-27]  Walker spoke with his daughter on this day, telling her that he felt like was he was "going to bust" and that he had been telling them he needed to go to back to the hospital.  On October 15, 2019, Houk made the following notation: "Appt rescheduled for Oct 22nd [at] 8:30 [a.m.]"  The defendants contend that the oncology office rescheduled the appointment, while the plaintiffs allege that it was somehow Houk's fault.

On October 16, 2019, with no medical staff on the premises, MCDC Captain Jamie Wynn called Nurse Steenbergen because Walker had cancer and was complaining of dizziness and pain.  [Record No. 100-17, p. 152]  Steenbergen advised Wynn to check Walker's vital signs.  Deputy Jesse Parker attempted to check Walker's vital signs but Walker refused,

---

[2]      The Inmate Priority Movement Form indicates that Walker would be transferred to "KSR oncology." [Record No. 84-28]  Nurse Houk's signature is dated October 4, 2019, but in an errata to her deposition she stated that the date was incorrect and it had actually been October 14.  [Record No. 84-29]  Denise Burbett, APRN signed in the "approval/denial" space on October 16, 2019. Finally, on October 17, 2019, Lisa Teague signed below a handwritten notation stating "KSR oncology-hold ticket."

insisting that he needed to go to the hospital.  Wynn reported this to Steenbergen, who stated that he was "not going to the hospital."[3]  According to Wynn, Steenbergen said that medical staff would check on Walker in the morning.  Wynn did not go back and talk with Walker after calling Steenbergen and could not recall whether he checked on him again that evening.  Additionally, there is no indication that medical staff saw Walker on October 16 or 17.

Walker spoke with his son about his deteriorating condition on October 17.  Walker advised that he had lost a lot of weight and that his skin had changed color, remarking, "I hope this shit ain't busted or nothing."  Walker spoke with his daughter Jozlynne later that same day.  He told her, "I keep telling these bastards I need to go back to the hospital and they keep playing me like I'm stupid."  Jozlynne made a three-way call with Walker and Baptist Health, allowing Walker to speak with staff in the emergency department.  He advised them that he recently had surgery, was diagnosed with cancer, was in very bad pain, and was "very sick." The emergency department staff explained there was nothing they could do and advised him to talk with the jailer and medical staff at the detention center.  Jozlynne also called and visited the jail in person in an attempt to get medical attention for Walker.

On October 18, 2019, Houk met with Walker to "check on [his] wellbeing."  *Id.*  Walker reported that he had diarrhea after meals and the lymph nodes in his neck felt swollen and tight.  Additionally, he stated that it was "like a camera flash" in his eyes when he blinked.  He also reported heartburn and asked whether his Tylenol could be changed to ibuprofen.  Houk

---

[3]     Steenbergen did not recall this conversation at the time of her deposition.  [Record No. 100-19]  She reported that when she receives such calls, she "always" tells jail staff: "[Y]ou're the one on-site, if you feel like they need to go to the hospital, you need to send them."  *Id.* at 129.

checked and recorded Walker's vital signs, which remained stable.  She contacted Washington who gave orders for Tylenol 3, Zofran, and Prilosec.

Deputy Allan Dargavell recalled that Walker appeared weak and was having difficulty ambulating on or around October 19, 2019.  Another inmate told Dargavell that Walker was not able to get up and get his breakfast tray, so Dargavell walked his breakfast to him in his cell.  [Record No. 100-22, p. 134]  Later that evening when Dargavell was doing rounds, Walker advised him that he was "spitting up blood."  Walker had preserved some of the blood in a cup and asked Dargavell to take it down and "show the captain or something" to "try [and] get [him] some medical attention."  *Id.* p. 141.  Walker was struggling to move at that point and it was apparent to Dargavell that he was in significant pain and discomfort.

Dargavell took the cup of blood to his supervisor, Lieutenant Deanna Anglin, who was in the booking area.[4]  At that point, Dargavell "handed the entire situation over to [Anglin]" and returned to performing rounds.  *Id.* p. 144.  Anglin took a photograph of the cup containing blood and sent it to Steenbergen who advised Anglin to "just monitor him, and if anything changed, to let her know."  [Record No. 100-21, p. 103]  Steenbergen also instructed Anglin to move Walker to a medical isolation cell and "make sure he wasn't unresponsive" and "just to check his vitals."

MCDC staff moved Walker from his second-floor general population cell to a medical observation cell on the first floor.  Shortly thereafter, Walker expressed a desire to go back to his general population cell and was permitted to do so.  For reasons that are unclear, however, staff required him to return to the medical isolation cell shortly thereafter.  While Anglin

---

[4]     Anglin has since been promoted to Captain.  [Record No. 100-21, p. 13]

remembers Walker walking up and down the stairs each time, Dargavell recalls taking him downstairs in a wheelchair. [*Compare* Record No. 100-21, p. 125 *with* Record No. 100-22, p. 146.]

Anglin instructed her subordinate officers to make sure they were doing rounds every 20 to 30 minutes to "make sure he was doing okay." At some point during the night, Anglin called Steenbergen a second time and advised her that Walker was "having difficulty breathing and could not get up and down on his own." Anglin documented that Walker's blood pressure was 109/76 and his pulse was 124. Steenbergen instructed Anglin to just keep watching him.

Sometime later, likely in the early hours of October 21, Anglin called Steenbergen a third time. She reported that "Walker was not getting any better and that Deputy Dargavell had watched him try to drink some water, and it immediately came back up." [Record No. 100-21, p. 116] Steenbergen advised Anglin to let medical staff know about Walker when they came onto shift in the morning. Anglin reported that she checked Walker's vital signs hourly, "at least three times total," before a nurse arrived in the morning, but only one time is documented. [Record No. 100-21, p. 91]

Nurse Ginn came onto shift at 5:00 a.m. on October 21, 2019. Anglin reports that she immediately explained the situation to Ginn and Ginn and a deputy went down to see Walker. When they returned, Ginn told Anglin: "He is fine, and he is not going to the hospital." *Id.* at 122. There is no record of Ginn having seen Walker on October 21, but she is "sure [she] checked on him." [Record No. 100-25, p. 140] Anglin explained that since Ginn was a medical professional, she deferred entirely to her assessment regarding whether Walker needed to go to the hospital. There is no indication that Ginn (or any other medical staff member) checked on Walker after the 5:00 a.m. encounter. *Id.* at 144.

- 10 -

Deputies called for medical assistance to Walker's cell at approximately 9:20 a.m. on October 21.  Nurse Houk responded, finding Walker lying on a mat on the floor.  His pupils were dilated, he was responsive to name only, and Houk was unable to obtain his vital signs. EMS was called and took Walker to Baptist Health.  [Record Nos. 84-27; 84-34]  He was transferred to the University of Kentucky Medical Center where he presented with altered mental status, shock, and multiorgan failure.  [Record No. 84-35]  Walker remained at the hospital where he passed away on October 30, 2019, due to the effects of an intra-abdominal hemorrhage secondary to his cancer.  [*See* Record No. 84-36.]

## II.     Policies and Procedures

MCDC policy provides that its inmates "shall be entitled to health care comparable to that available to citizens and the surrounding community."  [Record No. 84-15]  SHP is responsible for providing medical services, although MCDC "deputies can perform health-related duties as described in their job descriptions" in some cases.  MCDC policy also requires that its staff be trained in first aid and CPR.  Specific medical treatments provided in the jail are to be recorded in daily logs, which are to be kept current "to the proceeding [sic] hour by medical staff."  *Id.*

MCDC policy 8-4 provides that "[e]mergency medical services are available 24 hours a day to inmates (with approval of the shift commander) to ensure prompt emergency medical attention."  [Record No. 84-16]  Pursuant to the policy, all deputies are trained to respond to medical emergencies, which include unconsciousness, serious breathing difficulties, severe pain, or other health or life threatening situations.  *Id.*  A deputy confronted with any of these situations will: "A) Immediately administer first aid B) Call the medical staff in accordance

with the medical emergency care plan, and relay the emergency information." The policy also provides that "[t]he deputy shall comply with the medical staff's instructions." *Id.*

Inmates may make medical complaints daily for review by qualified medical staff to ensure appropriate medical attention. [Record No. 84-11] They may do so by making a request for "sick call." These requests are collected daily by medical staff who prepares a list of the inmates requiring medical attention. MCDC requires that sick call by medical staff should be available to each inmate a minimum of three times per week. Additionally, MCDC Policy 8-3 requires that the "attending physician will perform sick call a minimum of one (1) time per week." *Id.*

All inmates booked into the jail complete a "standard medical questions" form. A copy of the form is placed in the "medical" inbox for pickup by SHP staff to determine the immediate medical needs (if any) of the inmate. [Record No. 84-4] SHP policy requires that inmates who answer "yes" to any of the standard medical questions be screened by medical staff within 24 hours. [Record Nos. 84-7, p. 5; 101-7, p. 49] They must receive a complete history and physical exam within 14 days. [Record No. 101-7, p. 51] Additionally, if a new inmate reports that they take prescription medication, medical staff takes steps to ascertain the identity of any medications to determine whether the inmate should continue taking them while in custody. This may include contacting the inmate's physician or pharmacy. [Record Nos. 100-19, p. 93; 101-7, p. 44]

SHP made "physician provider treatment protocols" available to its nurses. [Record No. 101-5] The cover page states: "It is the intention of these protocols for the nurse/medical staff to communicate to me signs and symptoms of their assessment PRIOR to the protocols being put into place." Washington explained that the protocols were reference tools for the

nurses' convenience and SHP policy did not require their use.  The protocols cover a wide range of medical complaints and provide instructions with respect to performing assessments. In some cases, the nurse is encouraged to contact the "physician/provider" only if certain symptoms are present; she may provide over-the-counter medications otherwise.  SHP also utilized "patient assessment and treatment guidelines," which was an additional set of guidelines for assessment and treatment.  [Record No. 101-6]  The cover sheet cautioned that the guidelines did not "take the place of good prudent medical judgment in the assessment and care of a patient."

SHP's policies provide that medical staff will report to the scene of an emergency upon notification by correctional officers.  However, if there is an obvious emergency, then officers are to call 911 immediately and can notify medical staff later.  If medical staff is not on-site during a "suspected but not emergent emergency, the correctional officers may call the nurse on-call as established and/or designated, or directly call EMS (911)."  [Record No. 101-7, p. 56]  A nurse was present at MCDC from 7:00 a.m. to 7:00 p.m., therefore, no medical staff was onsite overnight.  [Record No. 100-23, p. 76]

### III.   Motions to Limit or Exclude Expert Testimony

The parties seek to exclude or limit the testimony of each other's expert witnesses. These motions are governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or data;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

- 13 -

The Court acts as a gatekeeper to ensure that expert testimony is not only relevant, but also reliable. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). No definitive test or checklist applies when determining whether an expert's opinion is admissible under Rule 702. *Id.* at 593. Instead, "any relevant scientific or technical evidence must be the product of reliable principles and methods and must have been reliably applied in the case." *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021) (internal quotation marks omitted). This inquiry focuses on the principles and methodology applied, not the conclusions reached. *Daubert*, 509 U.S. at 595.

### A.    Plaintiffs' Motion to Limit Testimony of Kenneth Pennington, M.D.

The SHP Defendants retained Kenneth Pennington, M.D., to provide an opinion regarding Rodney Walker's cancer diagnosis. [Record No. 79-1] Pennington is physician licensed to practice in Indiana and is employed by Parkview Physicians Group in Fort Wayne, Indiana. He has been in practice since 1982 and is board certified in internal medicine and medical oncology. The plaintiffs do not appear to challenge Pennington's qualifications.

Pennington reports that Walker's August 28, 2019, CT scan showed metastatic cancer to the liver. According to Pennington, a CT scan from October 2, 2019, "confirmed the terribly aggressive nature of his disease." Pennington opines that Walker might have been a candidate for treatment had he been seen by a medical oncologist within two weeks of his August 28, 2019 surgery. If, at that time, his performance status had been appropriate for treatment, palliative chemotherapy could have been attempted which might have allowed him to survive for six to 12 months.

The plaintiffs argue that Pennington's testimony should be limited to the extent that he may not offer testimony that exceeds the scope of the opinions offered in his report. [Record

No. 79]  However, the plaintiffs do not identify any anticipated testimony that would exceed the scope of the opinions stated in Pennington's report.  The SHP Defendants point out that the plaintiffs elected not to depose Pennington and, therefore, are unable to identify potential issues involving the scope of his expected testimony.

The SHP Defendants also correctly observe that, while Pennington's testimony may not exceed the *scope* of his report, he is not constrained to reading his report into the record. *See Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("Rule 26(a)(2)(B) does not limit an expert's testimony simply to reading his report.  And no language in the rule would suggest such a limitation.  The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report.").

Based on the foregoing, the motion to limit Pennington's testimony will be denied.

**B.    Plaintiffs' Motion to Exclude the Report and Testimony of Grady Judson Bazzel, M.D.**

Grady J. Bazzel, M.D., is a family practice physician licensed to practice medicine in multiple states.[5]  His practice has been exclusively focused on corrections since 2005 and he is "very familiar with delivering medical care in such environments."  He holds the title of Certified Correctional Healthcare Provider from the National Commission on Correctional Healthcare.  [Record No. 80-1]

Bazzel's report indicates that he will testify regarding "all aspects of the practice of family medicine, both in general and specifically as it relates to correctional facilities," and that "the actions of the Defendants do not rise to the level of deliberate indifference."  Bazzel

---

[5]    Bazzel's report does not state who retained him to render an opinion in this case.  However, his opinion appears to relate to the SHP Defendants only and only the SHP Defendants responded in opposition to the plaintiffs' motion to exclude Bazzel's opinion.

opines that inmates have three specific rights related to medical care under the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97 (1976), and that Walker was not denied any of these rights during his time at MCDC.

An expert witness may testify in the form of an opinion regarding an "ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704. However, "[i]t is not for the witness to instruct the jury as to applicable principles of law, but for the judge." *Shahid v. City of Detroit*, 889 F.2d 1543, 1548 (6th Cir. 1989) (quoting *Marx & Co. Inc. v. Diner's Club*, 550 F.2d 505, 509-10 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977)). Accordingly, Bazzel may not offer opinions regarding the legal rights of prisoners. While he may testify regarding the nature, extent and quality of the medical care received, he may not testify that the defendants' actions were or were not deliberately indifferent in a legal sense. *See Davis ex rel. Estate of Price v. Roane Cnty., Tenn.*, 2015 WL 6738174, at *4 (E.D. Tenn. Nov. 4, 2015); *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994).

The plaintiffs contend that Bazzel also should not be permitted to testify regarding the standard of care or whether the defendants' alleged conduct satisfied it because he did not explicitly state the standard of care. However, "standard of care" is a legal phrase. *Norman Bamber, M.D. v. Prime Healthcare Kansas City-Physicians Servs., LLC*, 2019 WL 3456812 (W.D. Mo. July 31, 2019). The plaintiffs have not identified any authority that requires an expert to use this phrase in his report. Instead, his analyses and conclusions can establish his opinions on the standard of care that governs the defendant's conduct. *See Salzman v. United States*, 2020 WL 134214, at 4-5 (D. N.M. Jan. 13, 2020).

Bazzel opines that each of Walker's medical complaints was addressed and that he was sent to the hospital each time his condition was thought to warrant a higher level of care. He

also reports that the medical staff at MCDC made significant efforts to get Walker to his oncology appointment and to transfer him to a medical correctional facility. Bazzel's report makes clear that he believes the SHP defendants' conduct conformed to the standard of care applicable to healthcare providers in a correctional setting. It is also noteworthy that the plaintiffs elected not to depose Bazzel, which could have answered lingering questions regarding Bazzel's position on the applicable standard of care. Accordingly, this motion will be denied.

### C.    Plaintiffs' Motion to Exclude the Report and Testimony of Sherry Cobble, R.N.

Sherry Cobble has a Bachelor of Science degree in nursing from Milligan College and has been licensed as a Registered Nurse by the State of Tennessee since 1997. She has been employed by the Greene County Sheriff's Department as the Director of Nursing since April 2001, where she is responsible for the daily medical needs of inmates in the Greene County Detention Center. Based on her review of various items of discovery, Cobble concluded that the nurse defendants' actions "met the applicable standards of care and were not deliberately indifferent to the Plaintiff's medical needs." [Record No. 81-1, p. 4]

The plaintiffs contend that Cobble should not be permitted to testify that the defendants were not deliberately indifferent to Walker's medical needs. As previously explained, this is a legal conclusion to which a witness may not testify.

The plaintiffs raise several meritless arguments in support of excluding Cobble's testimony. They take issue with the inclusion of a statement in her report that the nursing staff "provided care." However, Cobble described the defendants' alleged conduct in detail, which she reported complied with the applicable standards of care. The plaintiffs contend that Cobble

- 17 -

failed to sufficiently explain how her experience led to her conclusions and how her experience was reliably applied to the facts. However, Cobble is qualified under *Daubert* to give an expert opinion on the standard of nursing care based on her 20-plus years' experience as a Registered Nurse and the Director of Nursing for a correctional facility. *See Huffman v. SmithKline Beecham Clinical Labs., Inc.*, 111 F. Supp. 2d 921, 930 (N.D. Ohio 2000) (citing *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1125 (9th Cir. 1994)). As with the defendants' other experts, the plaintiffs failed to conduct a deposition during which they could have questioned Cobble concerning perceived inadequacies in her testimony. At this point, these concerns involve questions of reliability rather than admissibility and can be addressed through cross-examination at trial.

However, some portions of Cobble's proposed testimony will be excluded as irrelevant. Cobble opined that, had Walker not missed his follow-up appointment with Dr. Kessler, "he would have likely discovered his cancer sooner." [Record No. 99-2, p. 4] As an initial matter, Cobble's opinion is factually inconsistent with the SHP Defendants' position that Walker already knew about his cancer diagnosis prior to entering the MCDC on September 30, 2019. [*See* Record No. 90-1, p. 1] The defendants also do not explain *why* an earlier cancer diagnosis would be relevant to the determination of whether appropriate care was provided. Instead, the relevant inquiry appears to be what *the defendants* knew or reasonably should have known about Walker's diagnosis. And Cobble does not explain the basis for her opinion that Walker likely would have discovered his cancer sooner had he not skipped his appointment with Dr. Kessler. A lay person could speculate that Walker would have learned more about his cancer diagnosis had he followed up with the CT scan Kessler recommended in September 2019. The

SHP Defendants have not identified any expertise or specialized skill of Cobble's that makes this portion of her report helpful to the jury.  As a result, it is inadmissible.

Finally, the plaintiffs seek to prevent Cobble from advising the jury that, by bringing Walker soup and crackers and asking him what he wanted to eat, Nurse Houk "demonstrat[ed] the care, concern, and compassion she ha[d] toward her patients."  The plaintiffs contend that this statement is not admissible because "the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or simple logic."  In other words, Cobble's assessment does not involve specialized knowledge and therefore would not be helpful to the jury.  The defendants failed to respond to this argument, so the Court concludes that they waive opposition to the exclusion of this portion of Cobble's report.

Based on the foregoing, the plaintiffs' motion to exclude the report and opinions of Sherry Cobble, R.N., will be denied, in part, and granted, in part.

### D.  Madison County Defendants' Motion to Exclude Testimony and Opinions of Jeffrey E. Keller, M.D.

Jeffrey E. Keller, M.D., is licensed to practice medicine in Idaho and several other states.  He began providing medical care to jail inmates in 1996 and has practiced correctional medicine full time from 2014 to the present.  He was the Chief Medical Officer of Centurion LLC from 2014 through 2019.  In that role, Keller supervised the medical care provided to inmates incarcerated in several state prison systems.  Keller reports that he continues to provide direct clinical care to jail patients and is familiar with the proper role of LPNs, RNs and APRNs in the provision of correctional medical care.

Keller's expert report includes opinions concerning the alleged shortcomings of both the SHP Defendants and the MCDC Defendants.  With respect to the MCDC Defendants,

Keller reports that Dargavell, Anglin and Wynn failed to take appropriate steps in response to Walker's symptoms and conditions.  He also opines that MCDC's practices, customs, and policies contributed to Walker's prolonged suffering and premature death.

Only the MCDC Defendants have moved to exclude Keller's opinion.  [Record No. 86] They contend that, as a healthcare provider, Keller has no education, background, or experience with correctional security services and, therefore, is not qualified to opine on these issues.  In support, the Madison County Defendants cite *Reece v. Shelby Cnty., Kentucky*, 2020 WL 6495486 (E.D. Ky. July 1, 2020).  There, Reece alleged that a deputy jailer orchestrated an attack on him that left him with injuries to his head and eye.  Following release from the Shelby County Detention Center ("SCDC"), Reece underwent a CT scan that revealed orbital and frontal sinus fractures.

Reece retained Renee Dahring, APRN, to review medical care provided to him by SHP and its agents while he was incarcerated at the SCDC.  The Shelby County Defendants sought to exclude Dahring's opinions concerning deficiencies in the healthcare provided by SCDC and its staff.  *Id.* at *11.  Reece did not oppose the Shelby County Defendants' motion.  In determining that this portion of Dahring's testimony should be excluded, the Court observed that Dahring had not reviewed SCDC's policies and her opinion was not based upon a qualified correctional or custodial methodology.

The Madison County Defendants also rely upon *Duka v. Lake Cnty., Ohio*, 2014 WL 5393546 (N.D. Ohio Oct. 22, 2014).  In that case, Duka sustained an eye injury while playing basketball at the Lake County Adult Detention Facility ("the Facility").  Healthcare staff at the Facility saw Duka twice for his complaints of vision disturbances and treated him conservatively.  Following continued complaints, medical staff advised him to "obtain a court

ordered furlough to see [his] own eye doctor." However, Duka did not pursue a court-ordered furlough. Following his discharge from the facility he was diagnosed with a detached retina which resulted in near-blindness in his right eye.

The defendants sought to exclude the expert testimony of nurse Maureen King, who opined that the care rendered to Duka "was below and deviated from the standard of care from nursing treatment, medical care, medical treatment and advice existing in that year." The court noted that King had no experience in correctional facility management and therefore was not qualified to offer opinions about correctional facility administration or the sheriff's performance of his job (i.e., training of Facility staff). *Id.* *9. Accordingly, the Court granted the motion to exclude.

The plaintiffs did not address either of these cases in their response to the MCDC Defendants' motion. In fact, they failed to cite any relevant authority. Instead, they maintain that Keller has a "nuanced, on-the-ground understanding of correctional staff involvement in the provision of healthcare. . . ." [Record No. 106, p. 4] But the Court is not persuaded that Keller, who has not worked in and has no educational background in the security side of corrections, is qualified to offer opinions regarding the sufficiency of the MCDC Defendants' actions and/or policies. Accordingly, this motion will be granted.[6]

### E.    Madison County Defendants' Motion to Exclude Testimony and Opinions of Rick J. Lawson, M.D.

Rick J. Lawson, M.D., has practiced as a hospitalist for 22 years and has "admitted and cared for hundreds of patients with GI and/or endocrine tumors" during that time." [Record

---

[6]    The SHP Defendants did not move to exclude Keller's opinions and this ruling does not apply to his testimony regarding their alleged conduct.

No. 87-5]  Lawson has treated prisoners in a hospital setting but has never provided care at a jail or detention center.  While his opinions appear to focus on the adequacy of care provided by the SHP Defendants, he concludes that the "group, in general, failed to take care of [Walker]."

The Madison County Defendants have moved to exclude Lawson's testimony and opinions, mainly because he has no expertise or specialized knowledge with respect to non-medical defendants.  [Record No. 87]  The plaintiffs respond that Lawson's report does not mention the individual correctional officers and he does not intend to testify that the correctional officers disregarded Walker's medical needs.  Further, the plaintiffs clarify, Lawson "does not opine on [MCDC's] policies but on SHP policies."  [Record No. 98, p. 2]

The Madison County Defendants have not identified any basis for excluding Lawson's opinions and testimony with respect to the SHP Defendants, nor does it appear that they intend to do so.  Accordingly, the motion to exclude will be granted insofar as Lawson may not offer opinions and testimony with respect to the conduct or policies of the Madison County Defendants.

## IV.   Motions for Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient

evidence from which the jury could render a verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

When a defense of qualified immunity is asserted, the analysis is altered somewhat. Specifically, the existence of a disputed, material fact does not preclude summary judgment if the defendants cannot be shown to have violated clearly-established law. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).

## A.     Loss-of-Chance Doctrine

The SHP Defendants contend that Walker's claims are based on the loss-of-chance doctrine, which is not a viable theory of recovery under Kentucky law. *See Kemper v. Gordon*, 272 S.W.3d 146, 152-53 (Ky. 2008). The typical loss-of-chance case occurs in the context of medical misdiagnosis: When a physician fails to properly diagnose a disease and the correct diagnosis is not made until sometime later, thus reducing the patient's chance of survival, the patient may recover for the lost chance of survival under the doctrine. *Id.* However, the Supreme Court of Kentucky has rejected this theory, refusing to conclude that "any chance at recovery, no matter how remote, entitles the plaintiff in a malpractice suit to have the issue of proximate cause submitted to the jury." *Walden v. Jones*, 439 S.W.2d 571, 575 (Ky. 1969).

The Court agrees with the plaintiffs that this is not a loss-of-chance case. To properly analyze this dispute, it is necessary to identify the injury at issue. Walker had been diagnosed with cancer, which the defendants assert was "stage 4." Of course the defendants did not cause Walker's cancer. And the record reveals that the defendants took adequate steps *with respect to Walker's cancer diagnosis*. Although Walker knew or had reason to know he had cancer, based on his September 4, 2019, appointment with Dr. Kessler, he did not share this information with jail staff upon booking. And while he complained of abdominal pain and other symptoms to SHP staff his first week at MCDC, there is no evidence that he mentioned the possibility of having cancer. When staff learned that Walker had cancer following his emergency department visit on October 12, 2019, they attempted to advance his appointment with Dr. Kessler and scheduled an oncology appointment. Additionally, priority movement to a medical correctional facility was initiated.

Sometime between October 13 and October 19, 2019, Walker developed an intra-abdominal bleed. [*See* Record No. 90-8, p. 38-39.] This is the condition to which the defendants' responses may have been inadequate and upon which the plaintiffs' claims may proceed. The plaintiffs' expert, Dr. Keller, has opined that, had the intra-abdominal bleed been discovered early, it more likely than not could have been successfully treated before it caused multi-organ failure and Walker more likely than not would not have died "prematurely." [Record No. 100-14] While a jury could conclude that Walker's life would have been cut short due to his cancer diagnosis, that is not a basis for barring the plaintiffs from potentially recovering damages based on the defendants' alleged actions which may have caused Walker pain and suffering and hastened his death.

### B.      Deliberate Indifference to Serious Medical Needs—42 U.S.C. § 1983

To prevail under 42 U.S.C. § 1983, the plaintiffs must show that Walker was deprived of a right secured by the Constitution or laws of the United States and the deprivation was caused by a person acting under color of state law.[7]  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010).  Private corporations performing traditional state functions such as the provision of medical services to inmates act under color of law for purposes of § 1983.  *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015).

States have an obligation to provide adequate medical care for individuals they incarcerate.  *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  For convicted prisoners, this right springs from the Eighth Amendment's protection from cruel and unusual punishment. The Fourteenth Amendment's due process clause grants similar rights to pretrial detainees. *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016).  To establish that the right to adequate medical care had been violated, Sixth Circuit jurisprudence traditionally required plaintiffs to prove objective and subjective prongs: the existence of a sufficiently serious medical need and that the defendant knew of and disregarded an excessive risk to inmate health or safety.  *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018).  This same test applied regardless of whether the plaintiff was a pretrial detainee or had been convicted of a crime.  *Id.*

This changed recently based on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), which addressed the standard applicable to an excessive-

---

[7]      A deliberate-indifference claim under § 1983 survives a plaintiff's death in Kentucky and can be maintained by his legal representative.  *See Hall v. Wooten*, 506 F.2d 564 (6th Cir. 1974); K.R.S. § 411.140.

force claim brought by a pretrial detainee. The Court determined that, because a pretrial detainee cannot be subjected to any degree of punishment, such a plaintiff is not required to establish that officers were *subjectively* aware that their use of force was unreasonable. Instead, he was only required to show that the officers' use of force was *objectively* unreasonable. In *Brawner v. Scott Cnty., Tenn.*, the Sixth Circuit extended *Kingsley* to deliberate-indifference claims, concluding that it is inappropriate to apply the same test to cases involving pretrial detainees and convicted prisoners. 14 F.4th 585, 596 (6th Cir. 2021).

In clarifying what is required to establish deliberate indifference to a serious medical need in light of *Kingsley*, the court stated that "[m]ere negligence is insufficient." Further, the court determined, "[a] defendant must have not only acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (quoting *Farmer*, 511 U.S. 825, 836 (1993)). The *Brawner* court set out the following elements: (1) an objectively serious medical need; and (2) that the defendant's action (or lack of action) was intentional (not accidental) and the defendant either (a) acted intentionally to ignore the plaintiff's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to the plaintiff, even though a reasonable official in the defendant's position would have known that the serious medical need posed an excessive risk to the plaintiff's health or safety. 14 F.4th at 597.

Of course *Brawner* only applies if Walker is considered a pretrial detainee. Courts have struggled with the question of whether a prisoner detained for a suspected probation violation is a pretrial detainee. *See Hill v. Cnty. of Montgomery*, 2018 WL 2417839, at *2 (N.D. N.Y. May 29, 2018) ("Whether to classify an individual detained for a suspected probation violation as a pretrial detainee or a convicted prisoner is an 'unresolved and difficult question.'") And

it does not appear that the Sixth Circuit has directly addressed the issue. *But see Ford v. Grand Traverse Cnty.*, 2005 WL 2572025, at *1 n.1 (W.D. Mich. Oct. 12, 2005) (concluding that defendant being held for suspected parole violation was imprisoned in connection with a convicted offense and, therefore, was not a pretrial detainee). Because the defendants have not made any effort to argue that the more stringent approach under the Eighth Amendment should apply, the Court will apply the test announced in *Brawner*.[8]

### 1.    SHP Defendants

The parties agree, for purposes of the defendant's motion for summary judgment, that Walker had an objective serious medical need. Accordingly, the Court will focus on the second inquiry under *Brawner*.

### a.    NP Roy Washington

The plaintiffs contend that Defendant Washington was deliberately indifferent to Walker's serious medical needs because he never examined him. It is undisputed that Washington failed to examine Walker during his single on-site visit during Walker's stay at MDCD. Ideally, Washington would have evaluated Walker, a recent post-appendectomy patient with complaints of severe abdominal pain. However, at the time of Washington's October 8 visit, Walker had not submitted a sick call request since October 2 and Washington had no knowledge of Walker's cancer diagnosis.

When Walker reported severe pain on October 12, Washington instructed nursing staff to send him to the emergency department. At that time, the defendants learned of Walker's cancer diagnosis and Washington initiated priority movement so that Walker could be

---

[8]    The SHP Defendants appear to concede that *Brawner* applies, while the MCDC Defendants say it is unclear which standard applies, but maintain that the plaintiffs cannot satisfy either.

transferred to a medical institution.  It appears that Washington's last involvement in Walker's care occurred on October 18, when Houk called him reporting that Walker complained of diarrhea, neck tightness, and visual changes.  Washington ordered new medications to address Walker's complaints.  [Record No. 84-27]

These actions (or failures to act) do not rise to the level of deliberate indifference to Walker's serious medical needs.  Although Washington failed to visit MCDC every week as his provider agreement anticipated, there is no evidence that this led to Walker's harm. Washington sent Walker for emergency care when he complained of severe pain, even before he knew of his cancer diagnosis.  Following the discovery of his cancer diagnosis, he acted reasonably by seeking to have Walker transferred to a medical detention facility.  There is no evidence in the record indicating that Washington could have done anything to accomplish this more quickly.  Washington was in communication with Nurse Houk on October 18, who indicated in her progress note that Walker's vital signs were relatively normal and did not indicate that any excessive risk existed.

Washington was aware that Walker was under the care of Dr. Kessler and was scheduled to see an oncologist on October 22.  Put simply, he reasonably concluded there was nothing more to be done than manage Walker's symptoms at that time.  "When a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and constitutionalize claims that sound in state tort law."  *Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004).  Accordingly, summary judgment will be granted in favor of Washington with respect to the plaintiffs' deliberate indifference claim.

b.      LPN Leslie Steenbergen

Nurse Steenbergen's first involvement in Walker's care was on October 16, 2019, when Captain Jamie Wynn called her concerning Walker's complaints of dizziness and pain. [Record No. 100-17, p. 152]  When Walker refused to allow a deputy to check his vital signs, Steenbergen stated that he was "not going to the hospital."  It does not appear that medical staff followed up with Walker until October 18.

Steenbergen reported in her deposition that, when she receives after-hours calls concerning potential emergencies, she "always" tells jail staff: "[Y]ou're the one on-site, if you feel like they need to go to the hospital, you need to send them." *Id*. at 129.  This advice appears to be contrary to SHP Policy and Procedure Manual J.2.02, which provides, "The Jail staff is to contact local emergency services for any urgent medical matters that may arise *when medical staff is unreachable* and not on-site."  [Record No. 101-7, p. 11]

Then, on October 19, 2019, when Lieutenant Anglin called Steenbergen to report that Walker was "spitting up blood," Steenbergen advised her to "just monitor him" and let her know if anything changed.  Anglin testified that Steenbergen did not provide specific instructions with respect to what she should monitor but later clarified that she said to check his vitals and "make sure he wasn't unresponsive."  Anglin called Steenbergen three more times that night, advising her that Walker could not get up and down on his own, was having difficulty breathing, and could not swallow water.  Instead of directing her to call an ambulance, Steenbergen advised Anglin (who had no medical training) to keep watching him and have a nurse examine him in the morning.

The record indicates that Steenberg knew that Walker had cancer and that he presented with alarming symptoms.  Her alleged decision not to inquire further and that he was "not

going to the hospital" after he would not allow his blood pressure to be taken could be considered deliberate indifference to his serious medical needs.  Further, when viewed in the light most favorable to the plaintiffs, her vague instructions to non-medical personnel to monitor him on October 20 and 21, as well as her instructions not to send him to the emergency room could constitute deliberate indifference.  *See, e.g., Sours v. Big Sandy Regional Jail Auth.*, 593 F. App'x 478 (6th Cir. 2014).  Accordingly, the SHP Defendants' motion for summary judgment will be denied with respect to the § 1983 claim against Steenbergen.

### c.    LPN Jessica Houk

Houk's first involvement in Walker's care appears to have occurred on October 14, 2019, when she contacted Dr. Kessler's office to try and advance Walker's appointment per the emergency department doctor's recommendation.  The plaintiffs contend that Houk should have done this earlier, but a 24-48 hour delay in calling to ask about having an appointment rescheduled does not constitute deliberate indifference.  The plaintiffs also appear to blame Houk for the fact that Walker's oncology appointment was rescheduled from October 15, 2019, to October 22, 2019.  [Record No. 101-1, 42]  However, they have not identified any evidence to support that assertion.

When Houk checked on Walker on October 18, he reported troubling symptoms including diarrhea, a swollen neck, and visual disturbances.  Houk took Walker's vital signs and reported his symptoms to Washington, who adjusted Walker's medications.  Houk's final encounter with Walker was when deputies called for medical staff the morning of October 21.  Walker attempted to obtain vital signs and stayed with Walker until he was taken away by EMS.

The plaintiffs have failed to identify any of Houk's conduct that could be considered deliberate indifference to Walker's medical needs. Walker was undoubtedly quite ill when Houk saw him on October 18, 2019. However, she documented his complaints, recorded his vital signs, and consulted with the higher-level provider—NP Washington. To the extent Houk did not adhere to the provider protocols in examining Walker or otherwise erred in performing an examination, such failures do not constitute deliberate indifference. *See Griffith v. Franklin Cnty.*, 975 F.3d 554, 578 (6th Cir. 2020) (quoting *Winkler*, 893 F.3d at 891-92). Accordingly, Houk's motion to dismiss the § 1983 claim will be granted.

### d.   LPN Kandi Ginn

Nurse Ginn was the first provider to see Walker, as she responded to his initial request for medical care on October 3, 2019. In response to Walker's complaints of severe side pain, Ginn checked his vital signs and documented her findings, as well as his complaints, and gave him 600 milligrams of ibuprofen. While this procedure may not have complied with SHP's "correctional nursing patient assessment and treatment guidelines," it was not a complete failure to treat and does not constitute deliberate indifference to his medical problems. [*See* Record No. 101-5, p. 97.]

Ginn next saw Walker on October 8 when he still complained of stomach pain and a sensation of food getting caught in his stomach. Ginn called Washington, who advised her to contact Walker's surgeon for further instructions. After determining that "Dr. Kiser" was actually Dr. Kessler, Ginn contacted Kessler's office on October 11 and learned that Walker had failed to attend his follow-up appointment prior to his incarceration. Kessler's office scheduled an appointment for Walker on October 23, 2019.

Then, on October 12, 2019, when Walker "could not move and was in pain," Ginn contacted Washington, who advised her to send him to the emergency department for evaluation.  The plaintiffs have not identified any deficiencies with Nurse Ginn's conduct during this encounter.

Ginn's final contact with Walker occurred shortly after she came onto shift the morning of October 21, 2019.  Lieutenant Anglin explained to Ginn that Walker's condition had been deteriorating overnight—i.e., that he had been coughing or spitting up blood, had been having difficulty moving on his own, and had had difficulty breathing.  According to Anglin, Ginn and another deputy went to the medical isolation cell where Walker was being held.  When they returned, Ginn announced, "He is fine, and he is not going to the hospital."

Ginn disputes Anglin's recollection of events.  [Record No. 100-25, p. 140]  She stated that if she examined Walker, she would have documented it.  However, she conceded that there is no documentation reflecting that she examined (or had any encounter with) Walker on October 21.  Although she was foggy on the specifics surrounding the incident, she was "sure [she] checked on him."  Ginn also conceded that, given Walker's symptoms, that she should have contacted NP Washington.  Given these facts, a jury could determine that Ginn was deliberately indifferent to Walker's medical needs on October 21, 2019.  *See Sanchez v. Oliver*, 995 F.3d 461, 474 (5th Cir. 2021) (recognizing that failure to assess patient meaningfully might rise to the level of deliberate indifference); *Dauzat v. Carter*, 670 F. App'x 297, 298 (5th Cir. 2016) (determining that nurse's failure to refer patient with obvious serious medical need to physician was unreasonable).  The SHP Defendants' motion for summary judgment will be denied with respect to the § 1983 claim against Ginn.

**e.     SHP**

The plaintiffs also allege that SHP was deliberately indifferent to Walker's serious medical needs based on its failure to train and supervise the medical staff at MCDC.  However, by its terms, section 1983 creates liability against *persons* who cause deprivations of constitutional rights.  Liability may extend to a governmental entity under § 1983 only when its official custom or policy causes a violation of constitutional rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Likewise, a private corporation acting under state law may be liable under § 1983 where its custom or policy caused a constitutional violation.  *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996).

"To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations."  *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015).  The plaintiffs focus on SHP's alleged failure to adequately train and supervise the LPNs at MCDC.

Liability under § 1983 can be based on a failure to train or supervise when the training and supervision were inadequate for the tasks the LPNs were required to perform, the inadequacy resulted from the SHP's deliberate indifference, and the inadequacy actually caused, or is closely related to, Walker's injury.  *See Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015).  "Single-incident liability" is available in cases alleging inadequate training of nurses in a correctional setting."  *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 386 (6th Cir. 2018).  Under this theory, the plaintiffs can establish a single violation of constitutional rights, accompanied by a showing that SHP has failed to train its employees to

- 33 -

handle recurring situations presenting an obvious potential for a constitutional violation. *Id.* (citing *Shadrick*, 805 F.3d at 738-39).

The plaintiffs rely heavily on *Shadrick*, which focused on the lack of training SHP's nurses received. However, several of the problems identified in that case are not present here. While SHP's training program is not perfect, LPNs receive on-the-job and online training after which they are expected to complete online testing. Unlike the nurses in *Shadrick*, Houk and Ginn were familiar with the training materials and Steenbergen ensured that the medical staff adhered to SHP's policy and procedures by her "chart audit, or [her] audits twice a year, when they signed the book or signed it off online, if they have read it and understand the policy and procedures." [Record No. 100-19 p. 118]

The more troubling issue appears to be SHP's practice regarding supervision of LPNs. It is clear from the record that the LPNs, who may not diagnose or treat illnesses, had significant discretion when it came to healthcare decisions at MCDC. Nurse Practitioner Washington, the medical director of the facility, stated in his deposition that he did not supervise the LPNs and never gave them any guidance concerning when they should contact him about a patient. [Record No. 100-24, p. 64] While SHP and MCDC's agreement anticipated that SHP would provide nurse practitioner services "at least once per week, for up to four hours each visit," Washington only visited MCDC once every two weeks for approximately four hours each time. *Id.* at 71, 199. Accordingly, LPNs were the only providers on site to assess and treat patients the vast majority of the time.

The plaintiffs present the opinion of Jeffrey Keller, M.D., who reports that SHP set up a system that was inadequate to provide competent healthcare to sick patients at MCDC. Specifically, he contends that SHP staffed the jail exclusively with LPNs that were not properly

- 34 -

supervised.  [Record No. 100-14, p. 19]  According to Keller, LPNs must be supervised by physicians or RNs and, unsurprisingly, cannot be supervised by other LPNs.  However, Houk and Ginn identified Steenbergen as their supervisor.  Keller also reports that the Kentucky Board of Nursing requires the supervising provider to be physically present in the immediate vicinity of the LPN for any patient whose condition "is not stable or predictable," which was the case for Walker the last several days of his incarceration.  *Id.*

Finally, Keller contends, "being on-call to themselves make medical decisions about patients they were not seeing also exceeded the scope of practice of the jail LPNs."  According to Keller, had the LPNs been appropriately supervised, "more likely than not, Mr. Walker's deteriorating condition would have been discovered and he would not have suffered unnecessarily and would not have prematurely died."  *Id.*  Keller also suggests this could have been avoided by having medical staff on-site during the night or sending medical staff into the jail during evening hours to examine patients who presented with urgent, non-emergent medical needs.  "Since the LPNs were on call, but had no arrangement to return to do patient evaluations, they were forced to make complex medical decisions without all of the essential data they would have gathered had they actually seen the patients themselves."

Based on the foregoing, there is evidence from which a jury could conclude that the "potential risk of the commission of constitutional torts by LPN nurses who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting is so obvious" that SHP's failure to provide supervision and training constitute deliberate indifference to the risks presented.  *See Shadrick*, 805 F.3d at 739-40.  Accordingly the SHP Defendants' motion for summary judgment will be denied with respect to the § 1983 claim against SHP.

### 2.      MCDC Defendants

#### a.      Qualified Immunity

The MCDC defendants invoke the defense of qualified immunity, which "gives ample room for mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). The Court follows a two-step inquiry to determine whether the defense applies. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).   First, taken in the light most favorable to the party asserting the injury, the Court considers whether the official's conduct violated a constitutional right.   Second, the Court asks whether the right was clearly established. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).  These inquiries can be addressed in any order and if either is not met, the government officer is entitled to qualified immunity. *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018).

Once the defendant raises the defense of qualified immunity, the plaintiff has the burden of showing that it does not apply. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

#### b.      Individual Defendants

The plaintiffs contend that Defendant Wynn acted with deliberate indifference during his October 16, 2019 encounter with Walker.  On that date, Walker told Wynn that he had recently been diagnosed with cancer, was dizzy, and was not feeling well.  Wynn called Steenbergen, who was on call, and she instructed him to check Walker's vital signs.  However, Walker would not allow jail staff to assess his vitals, insisting that he needed to go to the hospital.  Upon reporting this to Steenbergen, she said that Walker was "not going to the hospital."  Wynn did not send Walker to the hospital and did not take any further action.

- 36 -

Walker's daughter, Jozlynne, testified during her deposition that she called MCDC and spoke with Wynn who told her that Walker had refused to have his blood pressure taken. Jozlynne advised Wynn that "he refused because he really needs to go to the hospital." According to Jozlynne, Wynn hung up on her.

The plaintiffs contend that Dargavell was deliberately indifferent for failing to call 911 or take further action on October 20 and 21, 2019, when he observed that Walker was spitting up blood and having problems breathing and walking. Additionally, the plaintiffs allege that Defendant Anglin was deliberately indifferent for failing to call 911 despite Steenbergen's instructions to "just watch him" until a nurse came on shift the morning of October 21.

When determining whether a constitutional right is clearly established, this Court looks first to decisions of the United States Supreme Court and then to decisions of the Sixth Circuit. Clearly established law is not defined at a high level of generality. *Vanderhoef v. Dixon*, 938 F.3d 271, 278-79 (6th Cir. 2019). Instead, "the rule's contours must be so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful *in the situation he confronted*.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (emphasis added); *Gordon v. Bierenga*, --F.4th--, 2021 WL 5905662, *3 (6th Cir. Dec. 4, 2021). While the plaintiff does not have to identify a case directly on point to demonstrate clearly established law, "the fact pattern of the prior case must be similar enough to have given fair and clear warning to [officials] about what the law requires." *Beck v. Hamblen Cnty., Tenn.*, 969 F.3d 592, 599 (6th Cir. 2020) (quoting *Carroll v. Carman*, 574 U.S. 13, 16 (2014)).

In support of their request for the denial of qualified immunity, the plaintiffs point to *Smith v. County of Lenawee*, 505 F. App'x 626 (6th Cir. 2012) (unpublished). There, the court observed that, "[i]f a prisoner is under the care of medical experts . . ., a non-medical prison

- 37 -

official will generally be justified in believing that the prisoner is in capable hands."  The court went on to quote a case from the Third Circuit: "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  *Id.* (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).  *See also Harrison v. Ash*, 539 F.3d 510, 520 (6th Cir. 2008) ("While there may be occasions where deliberate indifference could be found where prison officials fails to obtain medical assistance when the local jail staff has provided inadequate treatment, this is not such an occasion.").

However, comparisons drawn to an unpublished Sixth Circuit case and a Third Circuit case do not constitute clearly established law.  During each of the relevant encounters, medical staff had been consulted about Walker's care and the individual MCDC defendants knew it.  The defendants have not identified any case—constituting clearly established law or otherwise—in which correctional staff was required to override a medical provider's judgment and obtain emergency assistance for an inmate.  While the above-referenced cases suggest that there are scenarios in which this could be required, the plaintiffs have not identified any case in which it has occurred.  Accordingly, the individual MCDC Defendants are entitled to qualified immunity with respect to the plaintiffs' § 1983 claims.

### c.    MCDC

Municipal defendants generally are not liable when there is no constitutional violation by individual defendants.  *Brawner*, 14 F.4th at 597.  However, a constitutional violation may be attributable to a municipality's acts alone when a government actor in good faith follows a faulty municipal policy or when the combined acts or omissions of several employees acting

- 38 -

under a governmental policy violates an individual's constitutional rights. *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018). *See also Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993) (recognizing that "a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to qualified immunity").

The plaintiffs correctly observe that "contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988). The plaintiffs contend that MCDC is liable under *Monell* for its unconstitutional policies and practices, as well as its tolerance and/or acquiescence to the policies and practices of SHP. They seek to demonstrate that MCDC's official policies regarding inmates' medical care were constitutionally inadequate, that MCDC failed to adequately train its employees; and that MCDC tolerated and acquiesced to SHP's deficient conduct. *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

MCDC has little written policy addressing its staff's duties with respect to inmates' medical needs. MCDC Policy 8-4 ("Emergency Medical Services") provides that, when confronted with a medical emergency, corrections staff will call the medical staff and "comply with the medical staff's instructions." However, there is no written policy addressing what signs and symptoms corrections staff should look for in recognizing a medical emergency. Staff members used their "common sense and life experience" to determine whether prisoners' medical complaints were urgent, or if a prisoner could wait until later, or if they did not need care at all. [Record No. 100-22, p. 62]

Although MCDC policy provides that "deputies can perform health-related duties as described in their job descriptions," none of the deputies deposed in this matter had received

any relevant training, with the exception of CPR and first-aid.  MCDC staff regularly checked inmates' vital signs upon SHP staff request.  SHP staff would then use that information in their clinical decision making, typically while off-site where they could not personally assess the patient.

The "absence of a medical doctor, or of a round-the-clock nurse" is insufficient to render the staffing policy unconstitutional. *Winkler*, 893 F.3d at 902.  However, the plaintiffs have presented evidence indicating that, from 7 p.m. to 7 a.m., non-medically trained staff are expected to recognize and react to medical emergencies without any guidance or training. MCDC is responsible for providing adequate medical care to its inmates 24 hours a day.

The record also includes sufficient facts from which a jury could conclude that MCDC has failed to adequately train its staff concerning its *duty* to contact emergency medical services for inmates.  Chief Deputy Tom Jones testified as Madison County's Rule 30(b)(6) witness.  [Record No. 100-16]  He conceded that there was no written policy advising corrections staff when to call 911.  *Id.* p. 90.  While correctional staff relied on SHP to make nearly all medical decisions, staff were not required to consult a supervisor or the medical staff before calling 911 in the case of an emergency.

However, Captain Wynn testified that he did not know what the jail policies were with respect to prisoners experiencing emergency medical issues.  [Record No. 100-17, p. 71]  He stated that, if he had a problem, he would contact medical staff and would only contact 911 directly if an inmate was unresponsive.  *Id.* 72.  Further, he believed that corrections staff was permitted to call 911 for an inmate only if the inmate was non-responsive or if there was a "serious altercation" and the person had a serious injury.  *Id.* p. 83.  Wynn went so far as to say that, if an inmate was "collapsed unconscious on the floor," jail staff should call medical

first.  *Id.* at 85.  He conceded there was no classroom training or handouts provided regarding inmates' medical issues beyond what was contained in the policies and procedures manual.

Lieutenant Anglin agreed that the jail's practice is to contact medical staff in case of urgent medical situations, but reported that correctional staff have the authority to call 911 on their own.  [Record No. 100-21, p. 56]  However, Anglin was not aware of any policies and practices related to staff's ability to contact 911.  She then stated that the only time staff would contact 911 without going through medical first would be when an inmate is unresponsive.  *Id.* at 60.  Anglin also was also unable to describe with specificity any training offered with respect to recognizing or responding to inmates' serious medical needs.  She stated, "[t]here is a little bit of training. . . ."  *Id.* at 81.  She had received CPR, AED, and Narcan training, but did know whether she had received any training on the constitutional standards of medical care and access to care.

Deputy Dargavell testified that he could call 911 if someone was bleeding profusely or if someone clearly had a broken leg.  [Record No. 100-22, p. 56]  If someone was having difficulty breathing or was just in pain, he would walk them down to booking to see the supervisor and they would call medical.  Dargavell did not receive any training about whether or when moving a person in the midst of a medical emergency might affect the person's outcome.

While a non-medically trained officer may *reasonably* defer to a medical professional's opinion, MCDC may not maintain a policy of having its officers abdicate responsibility by blindly deferring emergency medical decisions to an LPN who is not on site to examine inmates.  *See McGaw*, 715 F. App'x at 498.  The facts here indicate that MCDC staff may not

- 41 -

have been trained to recognize the signs of a medical emergency and that they may have lacked adequate training to respond appropriately in the absence of onsite medical personnel.

Additionally, a jury could conclude that these deficiencies were a moving force behind the alleged constitutional violation.  *See Monell*, 436 U.S. at 692.  Wynn, who encountered Walker on October 16, took Steenbergen's word as final when she said that Walker was "not going to the hospital."  According to Wynn's deposition, he believed he was not permitted to call an ambulance for Walker under the circumstances.  The same is true for Dargavell, who believed that he could call 911 only if someone was "bleeding profusely or had a broken leg."  While Anglin recognized that she had authority to call 911, she deferred to Steenbergen and Ginn because they were the medical professionals.  Likely based on a lack of training and the requirement that they defer to the decision of medical staff, Dargavell and Anglin observed Walker the night of October 20 and the morning of October 21, 2019, as he struggled to move and breathe, but did not call an ambulance.

Based on the foregoing, a jury could reasonably conclude that MCDC's policy and/or failure to train reflects deliberate indifference regarding the serious medical needs of those with whom its deputies come into contact.  Accordingly, the MCDC Defendants' motion for summary judgment will be denied with respect to the § 1983 claim against MCDC.

### C.     State-Law Claims

### 1.     Wrongful Death

Wrongful death claims are separate and independent claims that arise upon a decedent's death and belong to enumerated statutory beneficiaries.  *Ping v. Beverly Enters., Inc.*, 376 S.W. 581, 598-99 (Ky. 2012).  The wrongful death statute provides:

- 42 -

> [W]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it.  If the act was willful or the negligence gross, punitive damages may be recovered.  The action shall be prosecuted by the personal representative of the deceased. . . .

K.R.S. § 411.130.

Damages in the wrongful death statute compensate for the loss of the decedent's earning power and are not intended to include the affliction to the family as a result of the wrongful death.  *Giuliani v. Guiler*, 951 S.W.2d 318, 323 (Ky. 1997).  The SHP Defendants concede that damages for wrongful death in Kentucky also include funeral expenses.  *See Boarman v. Com.*, 37 S.W.3d 759, 763 (Ky. 2001) (J. Stumbo dissenting).

The SHP Defendants contend that they are entitled to summary judgment with respect to the wrongful death claims because the plaintiffs have not produced any evidence of damages.  The defendants cite the following facts:  Walker was an inmate at the MCDC and was not earning money, he was on disability for a previous back injury, and he had been diagnosed with Stage 4 neuroendocrine cancer, which meant he "would never have been able to return to the labor force." [Record No. 90-1, p. 46]  Additionally, the SHP Defendants assert that the plaintiffs failed to provide an itemization of funeral expenses in their discovery responses and, therefore, a jury could not award those damages.

The plaintiffs respond that "Walker had been employed recently prior to his death despite his back injury, and the impact of his cancer diagnosis is clearly disputable."  According to Rontaveus Walker's deposition, Rodney Walker received disability payments and had "worked at a few jobs" in the six months prior to his incarceration, including at a company called Framebridge.  [Record No. 90-13, p. 6]

The value of a decedent's social security disability benefits is not recoverable under the wrongful death statute. *Aull v. Houston*, 345 S.W.3d 232 (Ky. Ct. App. 2010). However, the Supreme Court of Kentucky has observed that "damages flow naturally from the wrongful death of a person unless there is evidence from which the jury could reasonably believe that the decedent possessed no power to earn money." *Turfway Park Racing Ass'n v. Griffin*, 834 S.W.2d 667, 671 (Ky. 1992). While there is little evidence suggesting that Walker would have had the potential to earn money if not for the defendants' alleged conduct, this is generally a question for the jury. *See Chesapeake & O. Ry. Co. v. Bank's* Adm'r, 156 S.W. 109 (Ky. 1913) (concluding that jury could infer earning capacity of 82-year-old man, despite estate's failure to offer proof of his power to earn money).

Regardless, the plaintiffs dispute SHP's claim that they failed to provide an itemization of Walker's funeral expenses. They have attached documentation in support of these expenses to their response to SHP's motion for summary judgment. [Record Nos. 100-12, 100-13] The SHP Defendants did not address this in their reply in further support of their motion. Accordingly, the wrongful death claims will proceed.

## 2. Medical Negligence Against SHP Defendants

The SHP Defendants also contend that they are entitled to summary judgment with respect to the plaintiffs' wrongful death claims because there is insufficient evidence of their negligence. Under Kentucky law, medical negligence requires the following elements: (1) a duty of care; (2) breach of that duty; (3) actual injury; and (4) the injury was proximately caused by the negligence. *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 687-88 (Ky. 2003). Plaintiffs alleging medical malpractice are generally

required to put forth expert testimony to show that the defendant medical provider failed to conform to the standard of care. *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010).

With respect to Nurse Practitioner Washington, the plaintiffs cite the report of their expert Dr. Keller, who is expected to testify that Washington "violated medical standards of care, generally-accepted correctional medicine practices, and contributed to Mr. Walker's prolonged suffering and premature death." Keller provides specific examples of conduct he contends fell below the standard of care, including his failure to examine Walker at any time during his incarceration. Keller reports that, if Washington had examined Walker early on and performed an adequate examination (including abdominal palpation) he likely would have referred him for outside treatment earlier and "Walker would have survived."

Keller opined that Steenbergen's actions fell below the accepted standard of care when she instructed jail officials not to send Walker to the hospital on October 16, 2019, without examining him or consulting with a higher-level practitioner. He contends that she did so again on October 20 when she told Defendant Anglin just to watch Walker despite his alarming symptoms and deteriorating condition.

Keller also believes that Nurse Ginn's actions fell below the accepted standard of care when she failed to conduct an abdominal exam during multiple visits with Walker, despite his complaints of severe stomach pain. He also concluded that her conduct fell below the standard of care on October 21, 2019, when she said told deputies that Walker was "fine" and did not need to go to the hospital despite his gravely ill status and her alleged failure to examine him.

Finally, Keller opined that Nurse Houk violated accepted standards of care when she postponed Walker's oncology appointment without explanation and when she failed to

examine him or follow up on his condition after he reported diarrhea, swollen lymph nodes, and flashing in his eyes.

Plaintiffs' expert Rick Lawson, M.D., echoed several of these findings, including the conclusion that Walker's history and complaints of severe pain should have warranted an in-person examination by Washington.  [Record No. 100-15, p. 3]  Lawson also opined that Steenbergen's and Ginn's refusal to send Walker to the emergency department was a violation of the standard of care which contributed to/and or caused his "premature and, no doubt, very painful death."  Lawson stated in his report: "There is no doubt in my mind that had Mr. Walker been <u>expeditiously</u> transferred to University of Louisville Hospital, University of Kentucky Hospital or Jewish Hospital there is an excellent chance that he would still be alive today.  The actions of the medical (APRN) and nursing and Center's staff were more than negligent. . . and without a doubt caused Mr. Walker to suffer a slow and painful death." (emphasis in original).

The SHP Defendants contend these claims must fail because the plaintiffs have failed to present verifying medical evidence.  However, they have not cited any authority indicating that the plaintiffs' proposed expert testimony is insufficient or that the plaintiffs are required to produce more specific evidence pertaining to each individual defendant.  Accordingly, the SHP Defendants' motion for summary judgment will be denied with respect to the medical negligence claims.

### 3.      Vicarious Liability Against SHP

To hold an employer vicariously liable for the actions of an employee, the doctrine of *respondeat superior* requires a showing that the employee's actions were in the course and scope of his or her employment and in furtherance of the employer's business.  *Easterling v.*

- 46 -

*Man-O-War Auto., Inc.*, 223 S.W.3d 852, 855 (Ky. Ct. App. 2007).  SHP argues simply that there is no liability on the underlying negligence claims against the individual SHP Defendants.  Because the Court already has determined that a genuine issue of material fact exists, the motion with respect to *respondeat superior* also will be denied.

### 4.  Medical Negligence Against Madison County Defendants

The plaintiffs allege that Defendants Wynn, Dargavell, and Anglin breached their duty to provide medical care and to protect Walker from injury consistent with standard correctional practice.  The defendants contend that they are entitled to qualified immunity, which applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions; (2) in good faith; and (3) within the scope of the employee's authority.[9]  *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  Once the defendant has demonstrated that the act was performed within the scope of his or her discretionary authority, the burden shifts to the plaintiff to establish that the discretionary act was not performed in good faith.  *Id.* (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

The parties disagree regarding whether the defendants' challenged acts were ministerial or discretionary.  A ministerial act is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Id.*  Discretionary acts, on the other hand, involve "the exercise of discretion and judgment, or personal deliberation, decision, and judgment."  *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010).

---

[9]     The plaintiffs sued Wynn, Anglin, and Dargavell in both their individual and official capacities.  However, the plaintiffs do not appear to dispute that their state-law claims against MCDC, Wynn, Anglin, and Dargavell in their official capacities are barred by sovereign immunity.  *See Schwindel v. Meade Cnty.*, 113 S.W. 159, 163 (Ky. 2003).

The plaintiffs contend that the defendants' actions were routine and violated their duties to provide emergency medical services under MCDC Policy 8-4.   [Record No. 84-16] Specifically, the plaintiffs assert that the defendants summarily denied Walker's request for medical services and failed to call EMS despite the existence of an emergency.   The Court disagrees.   The MCDC staff defendants did not summarily deny Walker's request because they consulted with medical staff on each occasion, as they were directed to do pursuant to policy. Additionally, the written policy does not instruct staff members to automatically call EMS upon an inmate's request or when certain symptoms are observed.   Instead, the policy lists a number of conditions described as "emergency," which include serious breathing difficulties, severe pain, and health or life threatening situations.   Deputies are instructed to call medical staff and comply with their instructions.

The plaintiffs' claims are based on the individual deputies alleged lapses in judgment. In essence, they contend that the deputies should have recognized the seriousness of Walker's condition, "second-guessed the medical staff's decisions, and called an ambulance."   *Medley v. Shelby Cnty.*, 742 F. App'x 958, 961 (6th Cir. 2018).   Their decision not to do so clearly was discretionary.   And the plaintiffs have not shown that the defendants acted in bad faith, as their conduct did not violate any clearly established law of which a reasonable officer would have been aware.   Accordingly, Wynn, Dargavell, and Anglin are entitled to qualified immunity with respect to these claims.

### 5.    Loss of Consortium

"Consortium" is the "right to services, assistance, aid, society, companionship and conjugal relationship between a husband and wife."   *Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104, 107 (Ky. 2009) (quoting K.R.S. § 411.145).   The SHP Defendants contend that

they are entitled to summary judgment on this claim because there is no evidence of loss of consortium by Walker's now-deceased wife, Virginia. Specifically, they assert the following facts: Walker was not living with his wife prior to his incarceration; she did not visit him while he was in jail; she did not contact his children regarding his incarceration or condition; she did not come to the hospital to visit prior to his death; she did not attend his visitation or funeral; and she did not contact his children following his death.

The plaintiffs have offered Jozlynne Walker's competing testimony that the couple lived together prior to Walker's incarceration and were planning to move in with Jozlynne. This is contrasts with Kim Snowden's September 6, 2019 progress note, which indicated that Walker was moving in with his daughter to be away from Virginia.

Jozlynne testified that, on October 21, 2019, she called Virginia and explained what had happened to Walker, and she and Virginia both cried. Further, she stated that "a few people" reported that Virginia did not want to live anymore after she lost her husband. Jozlynne also testified that Virginia told her after Walker's appendectomy that he had to undergo further testing because the doctor suspected he had cancer. [Record No. 90-14, p. 10]

Damages for loss of consortium are appropriate when basic aspects of married life change as a result of defendants' conduct. *Ford v. Gen. Motor Corp.*, 305 F.3d 545, 556 (6th Cir. 2002) (abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Accepting the plaintiffs' evidence as true, Virginia did not live with Walker just prior to the defendants' alleged malfeasance, as he was incarcerated. The record also indicates that both were in and out of jail and the hospital, resulting in them being apart much of the time. Further, she did not attempt to contact him while he was in jail, even though she knew that he likely had cancer. Despite Jozlynne's repeated phone calls, Virginia did not visit

Walker when he was gravely ill at UK Medical Center or attend his funeral because, in Jozlynne's opinion, "she couldn't see him like that." Based on these facts, a jury could not reasonably conclude that the defendants' conduct led to a change in any basic aspects of Virginia and Rodney Walker's married life. Accordingly, summary judgment will be granted for the defendants with respect to the claim for loss of consortium.

### D.   Request for Adverse Inference Instruction

The plaintiffs included a request for spoliation sanctions in their response to the MCDC Defendant's motion for summary judgment. Specifically, the plaintiffs contend that the plaintiffs are entitled to an adverse-inference jury instruction based on MCDC's failure to retain video footage from the jail. But a response to the defendant's motion for summary judgment is not an appropriate avenue for bringing such a request, as it does not allow for proper briefing under the Local Rules.

### V.   Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.   The plaintiffs' motion to limit the testimony of Kenneth Pennington, M.D. [Record No. 79] is **DENIED**.

2.   The plaintiffs' motion to exclude the testimony of Grady Bazzel, M.D. [Record No. 80] is **DENIED**.

3.   The plaintiffs' motion to exclude the testimony of Sherry Cobble, R.N. [Record No. 81] is **GRANTED**, in part, and **DENIED**, in part.

4.   The Madison County Defendants' motion for summary judgment [Record No. 84] is **GRANTED**, in part, and **DENIED**, in part.

5.      The Madison County Defendants' motion to exclude the testimony of Jeffrey Keller, M.D. [Record No. 86] is **GRANTED**.

6.      The Madison County Defendants' motion to exclude the testimony of Rick Lawson, M.D. [Record No. 87] is **GRANTED**.

7.      The Southern Health Partners Defendants' motion for summary judgment [Record No.  90] is **GRANTED**, in part, and **DENIED**, in part.

Dated: December 17, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky